## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| SONRAI SYSTEMS, LLC | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 21-cv-02575 |
| v. | ) | |
| | ) | Judge John Robert Blakey |
| WASTE CONNECTIONS, INC. | ) | |
| | ) | |
| Defendant. | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Plaintiff Sonrai Systems, LLC ("Sonrai") sues Waste Connections, Inc. ("Waste Connections") alleging breach of contract; violation of the Defend Trade Secrets Act, 18 U.S.C. § 1832 *et seq.*; violation of the Illinois Trade Secrets Act, 765 Ill. Comp. Stat. 1065; and common law civil conspiracy. [54]. Waste Connections moves to dismiss all counts. [62]. For the reasons discussed below, the Court grants the motion [62] as to Count I, and denies the motion [62] as to Counts II, III, and IV.

## I.    **Background**[1]

Sonrai Systems, LLC, a technology company based in Naperville, Illinois, focuses its work on "technology, automation, and data collection" in the waste hauling industry. [54] ¶ 9. Sonrai's products include radio frequency identification (RFID) technology such as an "event validation system" that "establishes a computer based visual confirmation that the waste hauling service has been completed in real time

---

[1] The Court draws the facts from Plaintiff's Second Amended Complaint, [54].

on a satellite map" and Vector, a "comprehensive telematics and vehicle information system." *Id.* ¶¶ 10, 12, 13.

In 2013 and 2014, Sonrai embarked on a business relationship with Waste Connections Canada, an entity that operates refuse collection vehicles across the United States and Canada. The parties engaged in negotiations regarding potential use of the RFID technology and Vector, and pursuant to these negotiations, Sonrai installed and tested its technologies on some of Waste Connections' vehicles in 2014 *Id.* ¶ 28. Waste Connections, pleased with Sonrai's performance, expressed an intention to use Sonrai's products and services in all its trucks. *Id.* ¶ 30. Waste Connections proposed installing Vector onto its 4,860 trucks for a minimum of three years and paying Sonrai: (1) a price per Vector device; (2) additional hardware costs; (3) installation fees; and (4) a monthly per truck data fee. *Id.* ¶ 32. Waste Connections also proposed "specific pricing for add-ons to be provided by Sonrai on an as-needed basis," including, for example, inclinometers for older trucks and RFID units. *Id.* ¶ 33. Sonrai agreed to the proposed terms; Waste Connections' board of directors approved the terms of the agreement; and Waste Connections informed Sonrai that it would draft a "formal contract for execution." *Id.* ¶ 34.

Relying on the purported agreement, Sonrai "allowed Waste Connections to review the confidential information housed in Vector so long as Waste Connections paid the usage fees for the Vector service." [54] ¶ 40. Sonrai characterizes this as granting a license to use Vector. *Id.* ¶ 41. Although neither party alleges that they

executed a written contract containing the agreed-upon terms,[2] Sonrai began submitting sales orders and invoices to Waste Connections in May 2014 in accordance with those terms and Charles Palmer of Waste Connections signed the invoices. *Id.* ¶¶ 35, 42; [54] Ex. A (attaching samples of the signed invoices). Waste Connections also paid these invoices through June 2018—paying more than $950,000 over four years—but then ceased payment. [54] ¶ 44.

During the companies' relationship, Waste Connections worked with Anthony Romano, then Executive Vice President of Sonrai. *Id.* ¶ 46. Following a dispute internal to Sonrai, Romano resigned from Sonrai and Waste Connections then hired him. *Id.* ¶ 53. According to Sonrai, Romano and Waste Connections then enacted a "scheme to surreptitiously steal Sonrai's Vector technology." *Id.* Namely, post-resignation, Romano accessed "Sonrai's portal" without authorization to collect data as part of this scheme. *Id.* ¶ 54. Then Waste Collections and Romano worked together, "developing and implementing a technology platform that would imitate Sonrai's technology." *Id.* ¶ 55.

Sonrai alleges that a third entity played a role, too: Geotab, a company that supplied an electronic device Sonrai used to support Vector.[3] *Id.* ¶ 56. With Geotab on board, Waste Connections could "cut Sonrai out of the project and deploy Vector

---

[2] The Complaint uses the term "executed" to describe the contract, [54] at 40, which Defendant relies upon as a basis to conclude that Plaintiff pleads—and fails to attach—the existence of a written contract, [62] at 11. But the factual statements in the Complaint make clear that Plaintiff refers to an agreement developed through oral negotiations. [54] ¶¶ 32–35. As the term "execute" carries a variety of colloquial and technical meanings, the Court does not find Plaintiff's informal use of this term fatal to its claim.

[3] Neither Romano nor Geotab are parties to this case; Sonrai sued them in a separate action. *See Sonrai Systems, LLC, et al. v. Romano, et al.*, No. 16-cv-3371 (N.D. Ill., filed March 16, 2016).

across Waste Connections' entire fleet without having to compensate Sonrai for the use of Vector." *Id.* ¶ 56. In addition, Geotab's relationship with Sonrai gave it administrative access to Sonrai's website, which Geotab then gave to Waste Connections, thereby allowing "Waste Connections to view route and other information of Sonrai's customers." *Id.* ¶ 57. Without Sonrai's knowledge or approval, Waste Connections "obtained access to Sonrai's website through Geotab" and "changed the access codes and then locked Sonrai out of its own website." *Id.* ¶ 60.

Sonrai alleges that Waste Collections then began fabricating disputes between the two by "lodging system support complaints" as an excuse to sever the relationship. *Id.* ¶ 61. On March 1, 2016, Waste Collections informed Sonrai that it planned to transition to another service provider. *Id.* ¶ 64. Discussions between the two entities continued through November of 2017, and Waste Connections continued to pay Sonrai for the use of Vector until June 2018. *Id.* ¶¶ 65, 68. Thereafter, Waste Connections ceased payments but refused to return the Vector data, technology, and equipment. *Id.* ¶ 71.

Sonrai alleges that Waste Connections continued (and indeed, allegedly still continues) to use Vector without payment or permission. *Id.* ¶¶ 72, 73. In February 2020, the Region of Peel, Canada contacted Sonrai seeking technical assistance regarding an issue with Vector. *Id.* ¶ 75. The Region of Peel "provided Sonrai with passwords which permitted Sonrai to learn that Waste Connections is using Vector throughout Canada and the United States." *Id.* During this interaction, Sonrai first

4

learned "the extent of Waste Connections misuse of Sonrai confidential information." *Id.* ¶ 74.

Sonrai filed its initial complaint in state court on April 2, 2021. *See* [1]. Defendant removed the case to federal court and filed a motion to dismiss. Plaintiff then filed a Second Amended Complaint, which remains operative. [54]. The Second Amended Complaint (hereinafter "Complaint") asserts four claims against Defendant Waste Connections: (1) common law civil conspiracy; (2) violation of the Federal Defend Trade Secrets Act; (3) violation of the Illinois Trade Secrets Act; and (4) breach of contract. Defendant now moves the Court to dismiss all four counts pursuant to Federal Rule of Civil Procedure 12(b)(6), raising substantive arguments under each body of law as well as statute of limitations defenses. [62].

## II.   Legal Standard

To survive a motion to dismiss under Rule 12(b)(6), a complaint must provide a "short and plain statement of the claim" showing that the pleader merits relief, Fed. R. Civ. P. 8(a)(2), so the defendant has "fair notice" of the claim and "the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). A complaint must also contain "sufficient factual matter" to state a facially plausible claim for relief—one that "allows the court to draw the reasonable inference" that the defendant committed the alleged misconduct. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 556, 570). This plausibility standard "asks for more than a sheer possibility" that a defendant acted unlawfully. *Id.* (quoting *Twombly*, 550 U.S. at 557).

The Court limits its consideration to allegations set forth in the Complaint, documents attached to that complaint or referred to in it, and "information that is properly subject to judicial notice." *Williamson v. Curran,* 714 F.3d 432, 436 (7th Cir. 2013). In evaluating a complaint under Rule 12(b)(6), the Court accepts all well-pled allegations as true and draws all reasonable inferences in the plaintiff's favor. *Id.* The Court does not, however, accept a complaint's legal conclusions as true. *Brooks v. Ross*, 578 F.3d 574, 581 (7th Cir. 2009).

## III. Analysis

### A. Count I: Common Law Civil Conspiracy

Count I alleges common law civil conspiracy between Waste Connections, Geotab, and Anthony Romano to "gain control of Sonrai's Vector system and to cut Sonrai out of the plan to deploy Sonrai's Vector technology in Waste Connections' fleet of disposal trucks." [54] ¶ 83. Illinois law defines civil conspiracy as "a combination of two or more persons for the purpose of accomplishing by some concerted action either an unlawful purpose or a lawful purpose by unlawful means." *Adcock v. Brakegate Ltd.*, 645 N.E.2d 888, 894 (Ill. 1994).

Defendant moves to dismiss the claim based upon a numerous theories. [63] at 13–15.

First, Defendant relies on the law of agency, arguing that the alleged conspiracy between Defendant and Romano fails because "there can be no conspiracy between a principal and an agent." [63] at 14 (citing *Buckner v. Atl. Plant Maint., Inc.*, 182 Ill.2d 12, 24 (1998). Defendant accurately states this principle as a matter

of Illinois law, but its application does not doom Plaintiff's claim, for the Complaint alleges that Romano transitioned from Plaintiff's employ to a consulting role with Defendant during the relevant time. [54] ¶¶ 52–53. Moreover, as Plaintiff points out, Romano's role as a consultant does not definitively render him an agent of Defendant in all respects. *See Restoration Specialists, LLC v. Hartford Fire Ins. Co.*, No. 8-CV-644, 2009 WL 3147481, at *3 (N.D. Ill. Sept. 29, 2009) (noting that "Illinois courts have commented that the question of agency typically presents an issue of fact that seldom can be resolved at the summary judgment stage, much less on a motion to dismiss"). Further, the Complaint alleges that Geotab participated in the conspiracy as well. Therefore, even if the law precluded Plaintiff's allegations of onspiracy as between Defendant and Romano, the claim could survive as between Defendant and Geotab. In sum, because there remain allegations consistent with the Complaint that could entitle Plaintiff to relief, the agent-principal rule does not preclude Plaintiff's claim at this stage.

Defendant next argues that the Complaint fails to allege a required element: a qualifying tort committed in furtherance of the alleged conspiracy. [63] at 14. In response, Plaintiff maintains that it need only allege an overt act in furtherance of the conspiracy and need not allege commission of a tort. [69] at 14. Not so. As the Illinois Supreme Court explained in *Adcock* and subsequent cases, civil conspiracy does not constitute a standalone claim under Illinois law. *Adcock*, 645 N.E.2d at 894. Instead, it provides a mechanism for holding accountable members of a conspiracy for the unlawful action of other members. *See id.*; *McClure v. Owns Corning Fiberglas*

*Corp.*, 720 N.E.2d 242, 258 (Ill. 1999). Thus, proof of civil conspiracy requires proof of an underlying tort. *McClure*, 720 N.E.2d at 258 ("In order to state a claim for civil conspiracy, a plaintiff must allege an agreement and a tortious act committed in furtherance of that agreement.").

In arguing to the contrary, Plaintiff quotes *Adcock*, which states that a civil conspiracy complaint must allege that "the parties to the agreement committed some act in furtherance of the agreement, which is itself a tort." 645 N.E.2d at 894. Plaintiff appears to suggest that the phrase "which is itself a tort" refers to the "agreement" and not to the "act," and thus the alleged overt act need not constitute a tort in and of itself. But *Adcock* clearly stands for the opposite proposition because it expressly rejected the lower court's holding that "a cause of action for civil conspiracy exists when entities who have made an agreement to perform *overt* acts in furtherance of the conspiracy which cause injury to another, even if such overt acts do not themselves constitute independent, tortious conduct." *Id.* (emphasis in original). Instead, *Adcock* held: "To state a cause of action for conspiracy, a plaintiff must allege not only that one of the conspirators committed an overt act in furtherance of the conspiracy, but also that such act was tortious or unlawful in character." *Id.* (internal citations omitted). Moreover, where the underlying tort action fails, the claim for conspiracy also fails. *Indeck N. Am. Power Fund, L.P. v. Norweb, P.L.C.*, 735, N.E.2d 649 (Ill. App. Ct. 2000).

Alternatively, Plaintiff argues that the complaint sufficiently alleges a tortious act, [69] at 9, while Defendant disagrees, [70] at 9. The Complaint describes the

allegedly unlawful conduct that constitutes the overt act but does not identify a particular tort action to which the conduct gives rise. [54] ¶¶ 82–86. The parties identify two candidates for the underlying unlawful act: Defendant identifies it as misappropriation of trade secrets, while Plaintiff posits that it "involved breach of contract." Neither qualifies as an underlying tort.

First, as Defendant argues, [63] at 14, and Plaintiff concedes, [70] at 13, misappropriation of trade secrets cannot serve as a basis for a civil conspiracy claim because the Illinois Trade Secrets Act ("ITSA") preempts common law tort remedies for misappropriation of trade secrets. 765 Ill. Comp. Stat. 1065/8; *see also ExactLogix, Inc. v. JobProgress, LLC*, 508 F. Supp. 3d 254, 268 (N.D. Ill. 2020) ("At bottom, all common law claims based on misappropriation of trade secrets were codified, and preempted, by ITSA. This extends to confidential information, even where such confidential information does not actually fall within ITSA's statutory definition of a trade secret." (citing *Hecny Transp., Inc. v. Chu*, 430 F.3d 402 (7th Cir. 2005)).

Plaintiff's argument can only succeed, then, if it alleged an underlying tort that—as Plaintiff puts it—"involved breaching the contract." [69] at 14. Breach of contract on its own does not constitute a tort, however, and thus cannot serve as the basis for a civil conspiracy claim. *See Pomeranz v. Int'l Hotel Co.*, LLC, 359 F. Supp. 3d 570, 584 (N.D. Ill. 2019) (holding that breach of contract cannot serve as the basis for a civil conspiracy claim under Illinois law because it does not constitute a tort); *Hassebrock v. Ceja Corp.*, 29 N.E.2d 412, 421 (Ill. App. Ct. 2015) (holding that breach of contract does not constitute a tort under Illinois law); *Adams v. Pull'r Holding Co.*,

*LLC*, No. 09 C 7170, 2010 WL 1611078 (N.D. Ill. Apr. 20, 2010) (dismissing a civil conspiracy claim for failure to state a claim where the plaintiff alleged no underlying tortious act). Further, Plaintiff has not articulated any other tort theory tied to the alleged contractual breach, much less pled one.

Without an alleged underlying tortious act, Plaintiff's civil conspiracy claim fails. Thus, the Court dismisses Count I.[4] In light of the prior opportunity to amend, and because Plaintiff failed to identify any viable tort in response to Defendant's motion to dismiss, the dismissal is with prejudice.

### B.    Counts II & III: Trade Secret Claims

Defendant also moves to dismiss Counts II and III of the Complaint, which allege violations of the Defend Trade Secrets Act ("DTSA") and ITSA, respectively. Given the similarities between these causes of actions, the Court considers the two claims together.

The DTSA, 18 U.S.C. § 1832 *et seq.*, creates a private cause of action for misappropriation of trade secrets. Illinois state law creates a parallel cause of action through the ITSA, 765 Ill. Comp. Stat. 1065. To state a cognizable trade secret claim under either statute, Plaintiffs must allege: (1) existence of a trade secret; (2) that a

---

[4] Two more Count I issues warrant comment. First, Defendant argues that Plaintiff's civil conspiracy claim exceeds the relevant statute of limitations. Finding none of Plaintiff's arguments regarding the existence of an underlying tort viable, however, the Court has no mechanism by which to identify the relevant limitations period for, as Defendant notes, civil conspiracy draws upon the statute of limitations applicable to the underlying tort. *See Mauvais-Jarvis v. Wong*, 987 N.E.2d 864, 895 (Ill. App. Ct. 2013). As such, this Court thus makes no finding regarding the limitations period. Second, Defendant also argues that the Complaint fails to allege that the parties to the alleged conspiracy formed an agreement. While the Complaint does not use the term "agree" or "agreement," the Court finds the Complaint sufficiently alleges agreement because it alleges "collusion" for a stated purpose and engagement in a "scheme." [54] ¶¶83–84.

Defendant misappropriated; and (3) used in the Defendant's business. *UTStarcom, Inc. v. Starent Networks, Corp.*, 675 F. Supp. 2d 854, 864 (N.D. Ill. 2009).

### 1.    Existence of a Trade Secret

Defendant first argues that the Complaint fails to allege with requisite specificity the trade secret at issue. [63] at 3–4. The DTSA defines a trade secret as "business-related information that the owner of which has taken reasonable measures to keep secret and from which the owner derives economic value from the information not being generally known or readily ascertainable by others who could gain an economic advantage from the information." *Busey Bank v. Turney*, No. 21 C 2900, 2022 WL 92940, at *15 (N.D. Ill. Jan. 10, 2022) (paraphrasing 18 U.S.C. § 1839(3)). The ITSA similarly defines a trade secret as:

> information, including but not limited to, technical or nontechnical data, a formula, pattern, compilation, program, device, method, technique, drawing, process, financial data, or list of actual or potential customers or supplies, that: (1) is sufficiently secret to derive economic value, actual or potential, from not being generally known to other persons who can obtain economic value from its disclosure or use; and (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy or confidentiality.

765 Ill. Comp. Stat. 1065/2(d).

Defendant cites *IDX Systems Corp. v. Epic Systems Corp.*, for the principle that "plaintiff must do more than just identify a kind of technology and then invite the court to hunt through the details in search of items meeting the statutory definition," 285 F.3d 581, 584 (7th Cir. 2002). But Defendant misapprehends the standard applicable at this stage, since *IDX* sets forth the standard at summary judgment. Some of Defendant's other citations, [63] at 4–6, also invoke summary judgment or

11

preliminary injunction standards—both of which remain distinct from the standard that applies to a 12(b)(6) motion. At the pleading stage, trade secrets "need not be disclosed in detail in a complaint alleging misappropriation for the simple reason that such a requirement would result in public disclosure of the purported trade secrets." *AutoMed Techs., Inc. v. Eller*, 160 F. Supp. 2d 915, 921 (N.D. Ill. 2001) (quoting *Leucadia, Inc. v. Applied Extrusion Techs., Inc.*, 755 F. Supp. 635, 636 (D. Del. 1991)). Instead, courts "have found allegations to be adequate in instances where the information and the efforts to maintain its confidentiality are described in general terms." *Covenant Aviation Sec., LCC v. Berry*, 15 F. Supp. 3d 813 (N.D. Ill. 2014) (collecting cases). In this context, courts "only dismiss a claim for lack of specificity on the pleadings in the most extreme cases." *Fire 'Em Up, Inc. v. Technocarb Equip. Ltd.*, 799 F. Supp. 2d 846, 850 (N.D. Ill. 2011) (internal citation omitted).

> Here, the Complaint alleges that Sonrai's trade secrets include:

> Highly confidential and proprietary technological products and services that, among other things, collect data on truck chassis and the waste collection body of a garbage truck. For example, Sonrai has developed its exclusive "event validation systems" that, among other things, establishes a computer based visual confirmation that the waste hauling service has been completed in real time on a satellite map to be viewed by the waste hauling truck fleet operator.

[54] ¶10. And further:

> Another example is "Vector," a "comprehensive telematics and vehicle information system for the waste hauling industry." Vector "enables a waste hauling fleet truck operator to monitor all relevant data from the truck chassis and the waste collection body in nearly real-time."

*Id.* ¶13. Considering the governing standard, these descriptions sufficiently identify the alleged trade secrets at issue. At the pleading stage, the Complaint must

sufficiently apprise Defendant of the trade secrets Plaintiff intends to allege it misappropriated. *See Twombly*, 550 U.S. at 555. Here, the Complaint's allegations achieve that purpose.

Defendant next argues that the Complaint fails to sufficiently describe efforts to prevent disclosure of the purported trade secrets. Both the DTSA and ITSA require a plaintiff to take reasonable efforts to secure and maintain the secrecy of alleged trade secrets. 18 U.S.C. § 1839(3)(b); 765 Ill. Comp. Stat. 1065/2(d)(2). Here, the Complaint alleges that "the formulas and processes for the development of Sonrai's Vector and RFID technology is only known by a select few of Sonrai's employees. Sonrai does not disclose the formulas and processes for the creation of its technology to third parties." [54] ¶ 14. Further, Sonrai protects its confidential information by:

> limiting the disclosure and use of the information to only the Sonrai employees who need this information to perform duties on behalf of Sonrai; developing and implementing procedures regarding the use and protection of confidential information; obtaining a premier server for the storage of Sonrai confidential information; restricting access to this information by restricting access to computer networks and requiring the use of passwords to access its networks; requiring employees to execute (through its affiliated company ACES) written agreements that protect against the misuse and improper disclosure of Sonrai's confidential information; and entering into confidentiality agreements with companies that will have access to Sonrai's confidential information.

*Id.* ¶ 15.

According to Defendant, these allegations remain insufficient to state a claim because the Complaint: (1) does not allege a confidentiality agreement between the parties; and (2) does not differentiate the protective measures Plaintiff takes for the alleged trade secrets "from those imposed on any other corporate information." [62]

13

at 5 (citing *Opus Fund Servs. v. Theorem Fund Servs., LLC*, No. 17 C 923, 2018 WL 1156246, at *3 (N.D. Ill. Mar. 5, 2018)).

Courts generally acknowledge that determining the reasonableness of a given confidentiality measure requires a fact-based inquiry dependent on the specific circumstances. *See Learning Curve Toys, Inc. v. Playwood Toys, Inc.*, 342 F.3d 714, 725 (7th Cir. 2003). Indeed, "only in an extreme case can what is a reasonable precaution be determined as a matter of law, because the answer depends on a balancing of costs and benefits that will vary from case to case." *Id.* (internal quotation marks omitted); *see also Tax Track Sys. Corp. v. New Investor World, Inc.*, 478 F.3d 783, 787 (7th Cir. 2007) ("Typically, what [protective] measures are reasonable in a given [trade secret] case is an issue for a jury.")).

First, Defendant complains that the Complaint fails to allege that the parties had executed a written confidentiality agreement. Defendant would have this Court find the existence of a written confidentiality agreement a *sine qua non* to pleading the existence of a trade secret. Yet, courts do not uniformly accept this proposition. *See, e.g., Symbria, Inc. v. Callen,* No. 20-cv-4084, 2022 WL 60530, at *11 (N.D. Ill. Jan. 6, 2022) ("But the law does not require Plaintiffs to guard their trade secrets by mandating confidentiality agreements with each employee; Plaintiffs can maintain secrecy by, among other things, physically securing its facilities and limiting access to its secrets to employees on a need-to-know basis."). *But see Fire 'Em Up,* 799 F.Supp. 2d at 851 (suggesting that plaintiffs must allege a confidentiality agreement paired with additional efforts in order to state a claim). Without clear controlling

14

precedent requiring written confidentiality agreements in each and every case, this Court will not impose such a requirement at this stage.

Second, Defendant also argues that some of the facts in the Complaint suggest that Plaintiff did not take reasonable confidentiality measures regarding the alleged trade secret. Even if true, the question the Court must answer today remains focused on the pleading standard: Has Plaintiff alleged that it employed reasonable confidentiality measures to protect its alleged trade secrets? Plaintiff alleges that it enters confidentiality agreements and takes numerous other steps to protect its confidential information, including sharing information only on a need-to-know basis and using password protection in addition to other security technologies. [54] ¶ 15. The ultimate reasonableness of these measures remains an issue for which Plaintiff bears the burden of proof. Nevertheless, at this stage, Plaintiff's allegations suffice to allege the existence of a trade secret.

Finally, Defendant argues that Plaintiff fails to adequately allege that it derived economic value from the information not being generally known or readily ascertainable by another. But Sonrai alleges precisely that, reciting the statutory language, [54] ¶¶ 16, 17, and detailing facts regarding the value of its products. Defendant offers no authority suggesting that the law requires more at the motion to dismiss stage.

### 2. Misappropriation

Defendant next argues that the Complaint does not plausibly allege that it misappropriated any purported trade secrets. [63] at 7–9. It argues that because

Plaintiff permitted access to Vector as part of a business arrangement, Defendant's access cannot constitute misappropriation. But Plaintiff may show misappropriation under the DTSA and ITSA either by proof that Defendant: (1) acquired a trade secret knowing or with reason to know that it was acquired by improper means; or (2) disclosed or used the trade secret without express or implied consent. 18 U.S.C. 1839(5)(A)–(B); 765 Ill. Comp. Stat. 1065/2. Thus, the statutes acknowledge that what begins as permissive use may become misappropriation. Plaintiff's allegations regarding Vector fit well within the statutory definitions of misappropriation involving misuse.[5]

### 3.    Retroactivity

Next, Defendant argues that the DTSA claim fails because the DTSA went into effect on May 11, 2016—after Defendant allegedly locked Plaintiff out of its website by changing the access codes.[6]  [63] at 11 n.13.  While not retroactive, the DTSA applies to claims of continuing misuse that began before the statute went into effect and carried on afterward. *See, e.g., Brand Energy & Infrastructure Servs., Inc. v. Irex Contracting Grp.*, No. 16-2499, 2017 WL 1105648, at *4 (E.D. Pa. Mar. 24, 2017) ("Congress clearly expressed its intent to apply the DTSA to continuing

---

[5] The Court agrees, however, that Plaintiff does not plead misappropriation of any proprietary information other than Vector.  The Complaint describes an RFID "event validation system," [54] ¶ 10, but it remains unclear whether that system is integrated into Vector and part of the alleged misappropriations.  The only misappropriation Plaintiff alleges refers to Vector, and thus, Plaintiff's claim limits itself to misappropriation of Vector.

[6] The Complaint does not provide a date for the alleged lockout, although Defendant attaches an email referenced in the Complaint suggesting that it took place in March 2016.  [63-1] at Ex. A.  The Court's decision on this question does not turn on a particular date since Defendant's argument fails for the reasons explained, even if the lockout occurred before the DTSA went into effect.

misappropriations that began prior to—but continued after—the DTSA's enactment."); *Sonoma Pharms., Inc. v. Collidion Inc.*, No. 17-cv-01459, 2018 WL 3398940, at *5 (N.D. Cal. June 1, 2018) (same); *Syntel Sterling Best Shores Mauritius Ltd. v. Trizetto Grp.*, 15-cv-211, 2016 WL 5338550, at *6 (S.D.N.Y. Sept. 23, 2016) (same); *Adams Arms, LLC v. Unified Weapon Sys., Inc.*, 16-cv-1503, 2016 WL 5391394, at *5–7 (M.D. Fla. Sept. 27, 2016) (same). Here, Plaintiff alleges ongoing misuse, [54] ¶¶ 73–74, so the lockout date does not preclude the statute's applicability.

### 4. Statute of Limitations

Finally, Defendant argues that the applicable statutes of limitations bars Plaintiff's DTSA and ITSA claims. [63] at 9–11. DTSA provides for a three-year statute of limitations, beginning when the plaintiff discovers or by the exercise of reasonable diligence should have discovered the alleged misappropriation. 18 U.S.C. § 1836(d). Further, "a continuing misappropriation constitutes a single claim of misappropriation." *Id.* The parties offer competing interpretations of how to determine when the clock began to run here. Plaintiff argues that the triggering event took place in February 2020, when its communications with the Region of Peel, Canada, alerted it to the "extent" of Defendant's misappropriation. [54] ¶ 74. Defendant argues that the triggering event took place on or before March 1, 2016 when Plaintiff first learned that Defendant had access to the Vector website. [62] at 10. A third possible triggering date would be June 2018, when Plaintiff alleges that Defendant stopped paying for the use of Vector. *See* [54] ¶ 68.

17

Statute of limitations defenses, however, are typically addressed at summary judgment or at trial, so long as "there is a conceivable set of facts, consistent with the complaint, that would defeat a statute-of-limitations defense." *Sidney Hillman Health Ctr. of Rochester v. Abbott Labs, Inc.,* 782 F.3d 922, 928 (7th Cir. 2015). Defendant acknowledges this practice, but nonetheless urges the Court to dismiss the DTSA and ITSA claims as untimely because Plaintiffs had notice of the alleged violation by March 2016. Defendant cites and attaches an email as evidence of Plaintiff's knowledge. [63-1] Ex. A. This email from one of Defendant's employees to Plaintiff's executives states that at "the request of [Waste Connections], Geotab granted us administrative access to our system…" *Id.*

A court may only consider documents attached to a motion to dismiss if "they are referred to in the plaintiff's complaint and are central to his claim." *Mueller v. Apple Leisure Corp.*, 880 F.3d 890, 895 (7th Cir. 2018). Here, Defendant notes that the Complaint quotes a different portion of this email, [54] ¶64, so it argues that the Complaint incorporates the email by reference and renders it proper for the Court to consider at the motion to dismiss stage. [63] at 4. Merely quoting a document, however, does not automatically render it central to a claim. *See Mueller*, 880 F.3d at 895. Yet, even considering it at this stage,[7] the language Defendant quotes from it remains unclear as to exactly what access Geotab may have given Defendant or what Plaintiff may have reasonably understood Defendant would do with this access.

---

[7] Plaintiff does not dispute the validity or authenticity of the email nor oppose the Court considering it. *Cf. Mueller*, 880 F.3d at 895. (noting that the rule governing when a document is part of the pleading "is a liberal one—especially where the plaintiff does not contest the validity or authenticity of the extraneous materials").

Thus, the Court cannot conclude based upon this email alone whether Plaintiff definitively knew or should have known of the alleged misappropriations by the date of the email: March 2, 2016.

Next, Defendant points to Plaintiff's court proceedings against Geotab and Romano, arguing that this clearly evidences Plaintiff's knowledge of the alleged misappropriation as of March 2016. [63] at 4 n.4. Specifically, on March 16, 2016, Plaintiff filed a different lawsuit against several defendants including Geotab and former Sonrai employee Romano, alleging a variety of causes of action including an ITSA violation rooted in the same underlying facts as this suit. *See* [63-1] Ex. B.[8]

Plaintiff protests, arguing that it remained unaware of the "extent" of the misappropriation until the Region of Peel contacted it in February 2020, and noting in a footnote that Defendant continued to pay for the use of Vector through June 2018. [69] at 11. While the existence, not the extent, of the injury remains the relevant inquiry, the Court finds that Defendant's continued payments creates a factual dispute about the applicable timeframe. Reading the Complaint in the light most favorable to Plaintiff—as required at this procedural stage—Plaintiff may have remained unaware of Defendant's expanded and unauthorized use of Vector until after the payment stopped, despite knowing of Romano's apparent betrayal, which was the subject of the prior lawsuit. The parallel complaint does not allege Defendant's expanded and unauthorized use of Vector. *See* [63-1] Ex. B. Moreover, the Court cannot definitively conclude at this stage in the proceedings that Plaintiff's

---

[8] The Court may consider the parallel complaint at this stage based upon the judicial notice doctrine. *See Ennenga v. Starns*, 677 F.3d 766 (7th Cir. 2012).

knowledge regarding Defendant's use of its website on a particular date means that Plaintiff knew or should have known of the alleged misappropriation of Vector, too. The question of when Plaintiff knew or should have known of the misappropriation by Defendant remains unresolved. Thus, the statute of limitations question remains inappropriate for resolution at this stage.

Finally, while the DTSA has a three-year statute of limitations, the ITSA has a five-year limitations period. 765 Ill. Comp. Stat. 1065/7. If the Court credits Defendant's timing theory, the limitations period would have expired on March 16, 2021, prior to the filing of the initial complaint in this case. Given that the same factual disputes will determine the timeliness of both the DTSA and ITSA claim, however, the Court also cannot determine at this stage and on the current record the timeliness of the ITSA claim.

The Court thus denies Defendant's motion to dismiss Counts II and III.

## C.    Count IV: Breach of Contract

Defendant moves to dismiss Count IV of the Complaint, which alleges breach of contract, on the grounds that the Complaint fails to plausibly allege any elements of a breach of contract claim and relies instead upon conclusory legal allegations. Actions for breach of contract under Illinois state law must allege: (1) offer and acceptance, (2) consideration, (3) definite and certain terms, (4) performance by the plaintiff of all required conditions, (5) breach, and (6) damages. *Ass'n Ben. Servs., Inc. v. Caremark RX, Inc.*, 493 F.3d 841, 849 (7th Cir. 2007).

First, Defendant argues that the claim fails to allege agreement because Plaintiff does not allege that the parties executed a written contract and fails to attach any such document.  [63] at 11.  In response, Plaintiff alleges that the parties entered into an oral contract, agreed upon but never executed in writing.  [69] at 12.

Despite Defendant's assertions to the contrary, the lack of a writing alone does not doom Plaintiff's claim.  Where the parties have assented to all the terms of an oral contract, the "mere reference to a future written document does not negate the existence of a contract" or "end the inquiry into the intent of the parties." *Ceres Ill., Inc. v. Ill. Scrap Processing, Inc.*, 500 N.E.2d 1, 5 (Ill. 1986).  For example, "if the parties agree that a formal document will be prepared only as a memorialization of the oral agreement, the bargain is binding even though the document has not been executed." *Id.*; *see also Quake Constr., Inc. v. Am. Airlines, Inc.*, 565 N.E.2d 990, 996– 97 (Ill. 1990) (finding that a letter of intent could constitute an enforceable agreement despite a provision in the letter of intent that stated it could be cancelled if the parties did not execute a formal written contract).  Thus, the breach of contract claim here does not fail merely because the parties did not execute a written contract and the Complaint plausibly alleges agreement.

Next, Defendant argues that the Complaint fails to provide factual averments regarding consideration.  [63] at 11.  The Complaint, however, sets forth the alleged negotiated terms in a definite and specific manner:

> Palmer proposed the following financial terms for the rollout of Sonrai products and services on all 4,860 of Waste Connections' trucks for a minimum of three years: (1) the Vector device at a price of $246.70; (2) additional hardware including cables at $350 per truck; (3) an

> installation fee of $75 per truck; and (4) a monthly data fee of $45.29 per
> truck… Palmer also proposed specific pricing for add-ons to be provided
> by Sonrai on an as-needed basis, such as inclinometers for the older
> trucks in Waste Connections' fleet and RFID units.

[54] ¶¶ 32, 33. In addition, Plaintiff attaches invoices to the Complaint, which show the devices it installed and services it rendered pursuant to the alleged contract. [54] Ex. A. This remains sufficient to allege both consideration and performance by the Plaintiff of required conditions.

Defendant also argues that the Complaint does not plausibly allege a breach. [63] at 11–12. Again, not so. The Complaint alleges that Defendant breached the oral contract by employing the Vector technology in an expanded manner without compensating Plaintiff according to the terms of the agreement. [54] ¶ 122 ("Waste Connections breached the contract by not returning the Vector devices and not paying all of the usage and data fees it owes Sonrai.").[9]

Finally, Defendant argues that Plaintiff fails to allege that it suffered damages from any alleged breach. A plaintiff need not plead damages with specificity to survive a motion to dismiss. *See* Fed. R. Civ. P. 8. Here, the Complaint alleges damages by pointing to and attaching samples of unpaid invoices for "usage and data fees." [54] ¶¶ 123–25. Plaintiff's allegations do not rest on bare legal conclusions; they thus suffice at the motion to dismiss stage. Defendant's disputes regarding the basis for any damages award await resolution at a later stage in the litigation.

---

[9] Plaintiff also alleges that Defendant breached the contract by failing to return the Vector devices. [54] ¶122. The Complaint pleads no contract term, however, which would require their return. Unless Plaintiff can prove that there existed a contractual obligation to do so, failure to return the devices cannot constitute breach. The nonpayment allegations, however, suffice to plead breach at this stage.

Having alleged the six elements of a breach of contract claim, *see Association Benefit. Services,* 493 F.3d at 849, Plaintiff's claim must withstand one further argument from Defendant: that the breach of contract claim remains time-barred. Again, courts only dismiss a cause of action on statute of limitations grounds where the complaint clearly shows that the Plaintiff has pled itself out of court. *See Brooks*, 578 F.3d 574 at 579. Plaintiff has not done so here.

Defendant argues that the four-year statute of limitations of the Uniform Commercial Code governs the claim because the contract constitutes a sale of goods. [62] at 12. Plaintiff disagrees, arguing that Illinois law's longer limitations period for contracts outside the UCC applies because the contract primarily involves services rather than goods. [69] at 13 n.5.

Under Illinois, the UCC limitation period applies to contracts that predominantly relate to the sale of goods, but it provides a longer limitation period for contracts that predominantly relate to the sale of services. *See Belleville Toyota, Inc. v. Toyota Motor Sales, U.S.A., Inc.*, 770 N.E.2d 177, 194 (Ill. 2002) (employing the "predominant purpose" test to determine whether contract providing for both the sale of goods and rendition of services fell within Article 2 of the UCC).[10]

The Complaint itself suggests that the alleged agreement constitutes a mixed contract, blending goods and services. The question of whether goods or services

---

[10] In Illinois, actions "on written contracts typically have a 10-year period of limitations," 735 Ill. Comp. Stat. 5/13-206, "while actions on oral contracts have a 5-year period of limitations," *id.* § 13-205. *Crawford v. Belhaven Realty LLC*, 109 N.E.3d 763, 778 (Ill. App. Ct. 2018). Moreover, "even where a contract is in writing, the contract will be treated as *oral* for purposes of the statute of limitations if essential terms of the contract are not ascertainable from the written contract itself." *Id.* (emphasis in original).

predominate will thus prove significant in determining which statute of limitations applies. At this stage and on the current record, the Court cannot determine the contract's predominant purpose. Further, even if it could, that would not resolve the timeliness question because there remains a factual dispute regarding when the breach occurred. For example, if the breach occurred in 2016 when Waste Connections locked Sonrai out of its system, then the claim may prove untimely no matter which limitations period applies. On the other hand, if the breach occurred in June 2018 when Waste Connections stopped paying the invoices, then it remains *timely* regardless of which limitations period applies. Or, perhaps, the breach occurred on some other date. Given these many unresolved factual issues, the Court cannot decide the timeliness of Plaintiff's claim at this stage. Plaintiff's breach of contract claim may proceed.

## IV.    Conclusion

For the reasons stated above, the Court grants in part and denies in part Defendant's motion to dismiss [62] and dismisses Count I with prejudice.

Dated: February 28, 2023

Entered:

John Robert Blakey
United States District Judge

24